Thank you, Your Honors. May it please the Court, my name is David Cole, and I represent the Humanitarian Law Project. The last time this panel reviewed the material support statute, it held that the statute raised serious constitutional concerns under the Fifth Amendment principle of personal guilt, and that the prohibitions on personnel and training were unconstitutionally vague. Congress then amended the statute, in part in response to this Court's decision, but the revised statute is still constitutionally flawed. It is broader than the statute that you reviewed before in significant respects. It is more vague than the statute that you reviewed before in significant respects. And it still imposes vicarious criminal liability without any showing that the individual knew or intended that his or her support would further any terrorist activities. It's broader than it was before, because the statute now prohibits the provision of any services which the government says includes anything done for the benefit of a group. As a result, the statute now prescribes much of what the prior decisions by this panel and the prior panel expressly held were constitutionally protected activities. Joining a group, vigorously advocating on a group's behalf, petitioning Congress or the U.N., all are prohibited if they're done for the benefit of the group. At the same time, it's more vague than before, because the training prohibition now requires a would-be trainer to guess at whether the training they're given is a specific skill or just general knowledge. When Mr. Leonard was here before the en banc panel, he suggested that geography would fall within general knowledge, but the political geography of terrorist organizations would be a specific skill. I'm not sure what the principle was that drew that distinction. I'm not sure how anyone could teach geography without teaching the specific skills that geography entails. The expert advice and assistance provision now requires a would-be provider of any sort of assistance or advice to guess at whether their advice or assistance is derived in some way from some sort of scientific, technological, or other specialized knowledge. And the personnel provision requires plaintiffs to guess at whether joining a group or coordinating with it in any way will be seen as acting under its direction and control. When the government proposed that very definition in their case in New York, United States v. Sitar, that is, personnel means being a quasi-employee acting under direction and control, the court asked the government, well, how can we distinguish between being a quasi-employee acting under direction and control and being a member of the group? And the government said, you know it when you see it. And the court in the Sitar case said, that's not acceptable guidance when you face a 15-year prison sentence if you guess wrong, and if death results from something that you've done that in some way aids this group, you face life in prison. So this statute is worse in significant respects than the one that this panel previously found unconstitutional. I think the root of the problem, however, the root of the problem and why the reason this statute sweeps in so much protected activity, from advocacy to membership to the teaching of international law and the like, is that as interpreted by the government, the statute imposes vicarious criminal liability. It punishes A, not because A did something wrong, but because B did something wrong, without ensuring that there's any nexus between what A does and what B does. So in order to designate, for example, the PKK, a terrorist organization, the government had to find that it engaged in specific criminal activities, terrorist criminal activities. Our clients are then facing, would face 15-year prison sentences if they provide human rights training to that organization. Even if they can prove that human rights training is not fungible, can't be used to support terrorism in some way, even if they can prove that it did not, in fact, further any terrorist activity, even if they can prove that, in fact, it encouraged the group to pursue its disagreements through peaceful, non-violent means, rather than violent means, even if they can prove all of that, the government's claim is they would be criminally liable and face 15-year prison sentences. The government clearly has a legitimate interest in targeting support of terrorist activity, but it has to do it in a more narrowly tailored fashion than this statute. Counsel, in your view, is there any way that this court can interpret that term narrowly to avoid any constitutional issues? We have suggested, Your Honor, that were the court to interpret the statute as the Supreme Court interpreted the- I mean the training issue, that's what you were discussing. Is there any way we can narrow the interpretation of the definition of training so as to pass constitutional muster, in your view? Well, I think, I don't think there's a way that you could. I think there's a way that there's no way we can interpret the statute narrowly, in your view. Well, there's no, if you're asking about training specifically, I don't think so, for the same reason that the Ninth Circuit, the first panel held, we can't interpret it narrowly. We can imagine a narrower statute, for example, a statute that prohibited training in bomb making. That would be another matter, the court said, but we can't rewrite the statute in that manner. But I do think there is a way- How would Congress narrow it if you were on the committee? Well, I think there's a couple of ways. I think that one route would be to try to specifically identify those forms of assistance that, in fact, are either always due or are very likely to further terrorist activity. That's, I think, very difficult for a variety of reasons. The simpler way, and I think the constitutionally required way, and something that this court could do, is what the court did in Scales, which is to interpret the statute to require some showing that the individual who provided that training or provided that expert advice or provided those services either knew or intended that that support would further terrorist activities of the group. But wouldn't that be extending Scales beyond a circumstance that was not faced in the Scales case? Well, it would in this sense, Your Honor, because Scales was a membership case, exactly. But as we point out in our brief, in countless cases, courts have applied the Scales personal guilt principle to statutes that prescribe conduct. So, for example, the RICO statute, which doesn't prescribe association at all, it prescribes conduct, has been held constitutional only because it requires a showing that the individual engaged in conduct that was intended to further- But in this particular case, Congress set forth a mens re that was required for this statute. So how can we depart from that and say that we're being true to congressional intent? Well, for two reasons, I think, Your Honor. First, Congress defined the kind of knowledge that applies to the character of the group. So following this panel's guidance, it said that in order to be liable, the individual has to know that the group has engaged in terrorist activity. Congress was silent on what mens re applies to the other elements of the crime, which is provision of support. They didn't say whether it had to be knowing provision of support or intentional provision of support. And it's open to this court to read into that, to save its constitutionality, that kind of a requirement. In Scales, Congress said that knowing, that membership in a group, knowing of its purposes was a crime. And in other part of the statute, it had a specific intent provision for advocacy, specifically intending to further the illegal overthrow of the United States. So the membership clause did not have an intent requirement, but the court read into it an intent requirement in order to save its constitutionality. Our view is that there's really two options. One, given the case law, which has time and again held that the personal guilt principle requires some showing of a nexus. And in Scales it was specific intent. I'm not sure it needs to be specific intent. I think knowledge. But it's not knowledge of the character of the group. It's knowledge that your support will further the terrorist activities of the group. So for example, if my clients want to provide human rights training to the PKK, they should not be held criminally responsible if they can show that they neither knew nor had any intent of furthering any kind of terrorist activity. In fact, that kind of support couldn't conceivably support terrorist activity and yet under this statute it's a crime. Now the district court rejected this argument on the ground that conduct is different from guilt, which is really an extension of Scales. And indeed the prior panel in this case rejected the First Amendment challenge because it said this statute deals with conduct, not association. But the distinction between conduct and association might make some sense in the First Amendment context. It makes no sense whatsoever when you're talking about the Fifth Amendment principle of personal culpability. It is no less troubling from a Fifth Amendment personal guilt context to hold someone responsible for joining a gang than it is to hold someone responsible for providing mediation services to that gang in the hope that they will not engage in violence. Well how does that section now read? It's 33 9b. It requires the... I'm sorry, I have the amendments here rather than the full statute. But... It's not in either of any of the contexts. This is part of it, Your Honor. It says, to violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization, that the organization has engaged or engages in terrorist activity, or that the organization has engaged or engages in terrorist activity. So it essentially adopted what this panel had suggested was necessary with respect to knowledge about the character of the group. But again, it didn't talk about, it is silent on knowledge or intent with respect to the character of the support. And that's the principle that we're advancing here. And that would solve all of the vagueness problems because there's no constitution, it's not constitutionally protected to provide any kind of support with the intent or knowledge that it's going to further the terrorist activities of the group. Whether it's training or services or speech or association, it's not protected. How should that amendment have been written?  Well, I think it would have... In order to save the constitution out of the statute, it would require that an individual provide support to an organization, knowing that it's a terrorist organization, but also knowing or intending that his support will further the terrorist activity of the group. That's the nexus element. That's what distinguishes a statute that violates the principle of personal guilt from conspiracy statutes, aiding and abetting statutes, RICO statutes, anti-gang statutes, which all require some intent, some shared purpose to further the jointly held illegal aims, as the Fifth Circuit said in Ferguson versus Estelle. And that's what's missing here. Congress didn't expressly reject it. You know, in the federal system, there's whole business about general intent crimes, specific intent crimes. It's just all mixed up. There's a lot of confusion. What? A lot of confusion. A lot of confusion. And Congress sought to clear that up back in 1967, 68, when the Senate bill won. And that failed. Got nowhere. And so we don't have, in the federal criminal law, we don't really have clear distinctions between general intent crimes and specific intent crimes. I mean, what do you think? Is bank robbery a specific intent crime, would you say? I don't know, Your Honor. That surprised me. So but here you have a statute that you've got this knowledge requirement in there. And it certainly seems to me that, you know, that's enough to involve, you know, individual liability or culpability. I mean, you have knowledge that a group's a terrorist organization or you have knowledge that this group has involved in terrorist activities. And and you're working to aid that group. Right. But you're right. Why isn't that enough? Again, because of the of the principle of personal guilt. I mean, you could not, for example, say the American Coalition of Life Activists, a pro-life group, engages in some illegal activity, and therefore Congress can designate it an illegal organization and make any provision of services, any support to the American Coalition of Life Activists, a crime. In fact, this court held in its en banc decision in Planned Parenthood versus American Coalition of Life Activists, that even civil liability could not be imposed on someone for supporting the American Coalition of Life Activists unless they intended to further the illegal ends of the group. If it were enough to know that the group engages in illegal activity, much of criminal law could be rewritten, Your Honor. We wouldn't know the need to prove intent under RICO, conspiracy, aiding and abetting. We could just designate groups as criminal groups and then punish anyone who provides support. I think the reason it would violate fundamental principles of due process is, imagine the counselor who tries to provide mediation services to a gang. She knows the gang has engaged in illegal activities. Yeah, but we're not dealing with groups that are part of this country, in a sense. We're dealing with foreign terrorist organizations. That's right. And so then the question is, is there an analytical distinction between a foreign group and a domestic group? If it's clear that we could not do this with respect to Operation Rescue or Greenpeace, could we do it with respect to Amnesty International? I don't think so. A British-based group. I think it would be just as illegal to prohibit support of Amnesty International, and the government couldn't come forward and say, well, Amnesty International is incorporated in Great Britain, and therefore it's permissible. The scales principle, you have to remember, was, of course, created in the context of a group that Congress found was a foreign-dominated organization, essentially run by the Soviet Union. Congress found it engaged in terrorism for the purpose of violently overthrowing the United States by force and violence. So this principle was created in the context of foreign affairs and national security. The government says, well, clearly the court has repeatedly upheld, this court and the Supreme Court, upheld embargoes on trade with foreign nations. But that doesn't, that does not suggest that it's therefore permissible to target foreign political organizations and penalize them. So the Supreme Court, when it upheld the ban on travel to Cuba in the Reagan versus Wald case, held this is okay because it's an across-the-board restriction that applies to all. And it distinguished it from its decisions in Act Vector and Tent, where it struck down limitations on travel, denials of passports, to members of the Communist Party. So I think that the foreign domestic distinction really doesn't do any work in terms of this principle of personal guilt. And that's what's ultimately at stake here. It's also the case that when Congress makes it, or the president, embargoes trade with a foreign nation, it's a crime for you to travel to Cuba or have trade with Cuba. That's not an imposition of vicarious criminal liability. They designate Cuba for whatever reason they want to designate Cuba. They don't have to find that Cuba engaged in some criminal activity. By contrast, this statute does impose vicarious criminal liability because the only way that a group can be designated is if it is found to have engaged in illegal terrorist activity, number one. And number two, the extent of the penalty that the donor faces turns on what the recipient does. So if the recipient engages in some activity that leads to death, the donor faces a life imprisonment. And if the recipient engages in some activity that doesn't lead to death, the donor faces only 15 years. So this is vicarious criminal liability in its core form. And there's no reason that it ought to apply differently in the form for a group like Amnesty International, which is incorporated abroad, than to a group like Operation Rescue that is incorporated here. Let me say a couple of words about the vagueness of each of the four provisions, since my time is running out. The services provision, our position is that each of these four provisions, services, expert advice and assistance, personnel and training, remain unconstitutionally vague and substantially overbroad. They have no subject matter limits, and therefore they criminalize an almost limitless array of training, advice, services and the like. The government felt it was somehow inappropriate for us to identify how far removed from terrorism services, training and the like could be and still be criminalized. So even very trivial kinds of training that would have no connection whatsoever to terrorism are criminalized. But of course, that's the inquiry that the court has to engage in when it looks at whether it's substantial. Well, you've covered that in your brief. So we'll hear from the government. Thank you. May it please the court. I'm Douglas Letter from the United States Department of Justice here. I'd like to reserve three minutes of time for our cross-appeal for rebuttal, please. I'm going to start right in by addressing the points that my friend Professor Cole raised. Right off the bat, Professor Cole answered your question, Judge Pragerson, about foreign versus domestic. The problem with Mr. Cole's argument is it is foreclosed. This court has already in bank rejected that argument because, as you know, the first panel here issued a decision rejecting certain claims and this court in bank then affirmed that decision. This court said specifically there that the executive can restrict dealings of U.S. citizens with foreign entities. He didn't limit it, Judge Kaczynski writing there for the court, didn't limit it to foreign governments. And in fact, one of the examples he gives is a case called DKT Memorial Fund, which did not involve a foreign government, involved foreign entities. So the argument that Mr. Cole is making has been rejected by this court in bank. With regard to the specific intent argument also that Mr. Cole is making, there's another in bank problem. Mr. Cole is saying the specific intent argument, he says, we strongly urge you to adopt the dissenting decision by Judge Gregory of the Fourth Circuit because Judge Gregory said, I think you ought to read a specific intent requirement into the statute. Unfortunately, Judge Gregory was not joined by any of the other 11 judges on the Fourth Circuit who looked at the issue. Well, how would it hurt the government if a specific intent requirement was read into the statute? It would definitely hurt the government in the way that Professor Cole is describing it. Explain this. Because, Your Honor, we would then have to show that the intent of the donor was to support terrorism. Congress decided that, remember, the statute... You can show that by circumstantial evidence. I don't think that that's going to work. You can show it by circumstantial evidence. And then the judge says, you know, you've got a specific intent to aid this foreign terrorist organization. And then you can argue that, well, they knew who they were. They knew they were a foreign terrorist organization. Why do you think they provided these services? And that's all you have to do, isn't it? No, Your Honor. Why not? Here's the problem with that. I'll explain. Congress had something very different in mind. What you've described was already a crime under 18 U.S.C. 2339A. Congress realized that that was no good. Because suppose Mr. Cole's client says, I want to donate $100,000 to the Tamil Tigers. I'm going to write on the check, do not spend a penny of this for terrorism. I abhor terrorism. I'm very much against terrorism. Spend this only for things like orphanages, roads, schools. Congress decided that's no good because two reasons. One, money is fungible. If the Tamil Tigers get $100,000 for orphanages, they have $100,000 more to buy bombs. There's your argument on specific intent. Your Honor, I'm sorry, but that's not specific intent. That's exactly what Mr. Cole is arguing. Mr. Cole is saying if my client has a good intent, he can't be... Well, we can't look at his client's mind. That's right. His client can write anything on the check, you know. That doesn't mean the jury is going to buy it. It's a matter of argument. You can argue, well, you know, there's just so much money. And if money goes to this area, then that leaves money for another area. And you don't need to be a rocket scientist to figure that out. But that's not specific intent. I'm not sure what you would call that, but that's not what Professor Cole is arguing for. In addition, there's a second problem, Your Honor. And this gets to the heart of Professor Cole's argument. You know, a bank robbery is not a specific intent crime. You go in there into a bank, you intend to rob it, but it's a general intent crime. I'll take your word for it. No, it is. Again, I will take your word on that, Your Honor. I don't really mean that much. The second problem, though, is Professor Cole said, Look, my clients want to do things, provide aid that's not even fungible. They want to train the Tamil Tigers. Which, by the way, remember, we're talking about extremely dangerous, murderous terrorist organizations. These are not just simply humanitarian organizations. Professor Cole says, my clients want to train them to make presentations to the United Nations. Congress also wanted to get at another very serious problem with terrorist organizations, which is that this can enable them to build up goodwill. So, for example, we have different types of terrorist organizations. We have Al Qaeda. All Al Qaeda does is kill people.  But then we have groups like, say, Hamas. Hamas runs schools and orphanages where they teach children, kindergarteners from an early age, about the benefits of growing up to become suicide bombers and blow up Jews. Congress wanted, therefore, to get at people who are supporting Hamas in running kindergartens. Because for many of these organizations, if not all, it's all tied together. It's not that the Tamil Tigers have an orphanage over here that has absolutely nothing to do with the fact that they also assassinate the defense minister of Sri Lanka or set off a bomb in a building in Colombo and kill over 100 people. These are not things that are separate. They're all part of the same organization. Congress realized that, and that's why specific intent doesn't work for what Congress was attempting to accomplish. Counsel, what findings, what hearings and testimony and findings support that argument that Congress had that type of evidence in mind when the statute was enacted? Two things are. One, Congress made a specific finding. It's right there in the statute that foreign terrorist organizations, they're so tainted by their criminal activities that it's all put together. What was that based upon? What hearings, what testimony? Usually when Congress makes a finding in conjunction with legislative activity, there's been hearings and testimony that support that. I'm asking you in this case, what underlies that finding? What evidence, what documentary evidence or testimonial evidence underlies that finding? It certainly does. In addition to the statutory findings, Senator Feinstein, for example, spoke on the floor, and she said, made this very point, I'd be happy if the court wants in a post-argument letter to give you the specific citations and quotations from those hearings. Is there anything in the congressional record? Normally there's something in the congressional record where people testify that these orphanages are being used as recruiting grounds or are being used as grounds for psychological grooming for terrorism. Is there anything like that in the record? I don't know of any specific hearings, but one, it was well-known. Anybody who knew anything about terrorism in 1996 knew this was true. Well, that's a generic point, though. Yes. The Camel Tigers are a little bit different group than, say, Hamas. It's not the same situation. Every situation is going to be different from country to country. So wouldn't the findings, if there are any on that, I suppose, be buttressed or issued by the Secretary of State to the extent that there are specific findings in this case? Sure. And in this specific case, we have the declaration of Mr. McKean, who at the time was the Secretary of State's assistant for counterterrorism, and he makes this point as well. But you're right that different terrorist organizations are different. Well, let's take the Camel Tigers because we all know about the tsunami there and the fact that in some of those areas that were controlled by the Camel Tigers, people needed to get in to give aid. And so under those circumstances, the argument goes that if you wanted to go in, you had to be under their control and direction in order to give aid. And that's exactly what you're saying ought to be criminalized, right? Yes. Even though we have people suffering in those areas, and you have both former presidents saying we've got to get in and give aid. Your Honor, that is an argument that Professor Cole made, and in particular, an amicus brief, I think, by the ACLU. That's a policy argument. One can certainly say, Congress, we think you made a mistake. When people want to respond to suffering, they should be allowed to help terrorist organizations. In that sense, Camel Tigers are no different from Hamas, Hezbollah, any number of terrorist organizations that have mixed functions. There are orphanages in places that Hezbollah and the Hamas support. Obviously, I think everybody thinks that orphanages should operate. Let me switch gears a little bit. I gather under the statute, you would find it a criminal activity for a lawyer to represent these groups in the United States. It depends on what. Congress specifically provided that the organization, when designated, may challenge its designation. Yes, but the designation is effective when published. Yes. So, on publication, the designation. So, if someone hires a lawyer to get expert advice about whether to challenge the designation, legal or illegal? If it's tied in with challenging the designation, Congress... Where does it say that? The statute says the organization may challenge. Yes. That other part of the statute says you can't give expert advice. Right. So, how do we reconcile that? Easily, Your Honor. The statute quite specifically allows an organization to challenge. As we know, organizations cannot appear pro se in the United States courts. Therefore, they have to have lawyers. But there's no exemption specifically in the statute, is there? I'll get to that, Your Honor. Okay. If you don't allow them to have a lawyer, they can't challenge, and therefore, that part of the statute would be meaningless. Yes. That was where my question was heading on that aspect. Right. But remember, if there are two parts of the statute that seem to be inconsistent, can they be read together? And the answer is yes. But right here, we're examining the broader question of notice and liability. So, if you're a lawyer and you were hired by the panel tigers to go before the United Nations, that's a criminal act. Jim? Yes. How is a lawyer supposed to say, I think, I have to read between the lines of the statute, but I think it's okay for me to represent you in contesting the designation? A couple of things. Your Honor, may I have just a moment to go back to your prior question because I thought of something I also meant to say, your question about tsunami relief. Remember, Congress also took care of that specifically in Section 2339I, providing an exemption for certain types of activities. So, Professor Cole's clients can apply to the State Department. They can apply. They didn't exempt the tsunamis. They just said you can apply. They can apply. To my knowledge, they have not. I don't know why. If they truly want to do these things as part of something, why they wouldn't have even applied, but they didn't. So, I'm sorry to – No, no. Go ahead. Your Honor, this is one thing where it seems to me it's easy for a lawyer to read the statute and say, clearly, they need legal advice and representation on challenging. And, indeed, all they have to do is note that there have been a batch of challenges. In fact, one of the organizations here, the Tamil Tigers, did this very thing. They challenged in the D.C. Circuit, and the Secretary of State's determination was of help. They had lawyers. You can see that from F3. But if they advise them on anything other than the designation, that's a criminal act. Yes, most definitely. And that's why – because we don't want these organizations. Congress wants to – So, if they file, for example, an amicus brief here, that would be a criminal act. Yes, because Congress wants these organizations to be radioactive. We don't want U.S. lawyers, other U.S. persons to be saying, look, I want to help them in a good way. Because, again, that adds to the goodwill and the standing of the organization. You can make a – you can debate policy. You can say, you know – But they can't – no one can advocate for them in a policy – for that policy in the United States. They can't advocate as they're presenting their direction for that. What you said, these are policy choices. The Tamil Tigers are, as I say, they're a different group. We see a lot of immigration cases from Sri Lanka. It's a complex situation. It's not – it's unlike others. The Tamil Tigers – and one of your lawyers said this to me in oral argument a few months ago. The Tamil Tigers have never been a threat to the United States. Never been a threat to the United States. So it's a different type of situation with the Tamil Tigers. I'm not saying they're good, they're bad. But I'm just saying that there are arguments to be made on their behalf of why they should or should not be included. But after designation, if you make those arguments on their behalf in the United States, you've committed a criminal act. No, Your Honor, because you can try to convince the Secretary of State. You can hire a lawyer to do it. Well, if you don't convince. I mean, if you just go out and say, Congress, I think you ought to give an exemption. Right. Because remember, the problem with that is the Tamil Tigers don't have any constitutional right to petition Congress. Well, no, no. But the lawyer does. The lawyer is here. The lawyer can do that. That's where it implicates free speech and the notice process. Right. If the lawyer wants to say – just like Professor Cole. Professor Cole obviously believes this statute is a bad statute. He can and does lobby Congress saying you ought to change this statute. Mr. Cole hasn't come anywhere near violating the statute because he's not acting under the direction and control of the Tamil Tigers when he does it. No, I'm giving you the specific example of when they hire somebody. And I guess I think I understand your answer. You think, on behalf of the United States, they're not violating the law if they participate in the designation challenge process. But any other activity is a violation of the Statute of Criminal Act. When you say any other activity, the kind that we've been discussing, that's exactly right, Your Honor. Just like if the – it's no – seems to be different than a doctor saying I want to help the Tamil Tigers run a hospital. Because everybody agrees running a hospital is a good thing. And so I want to help the Tamil Tiger hospital number two. As I say, we want these organizations to be radioactive. We don't want organizations like Hamas, Hezbollah, the Tamil Tigers, the PKK operating in a world where they are treated as part of a legitimate community. That – Congress has made the policy decision. The Clinton administration and the Bush administration following it made that decision as well. The key policy determination is there aren't good terrorists. We're now drawing a distinction and determining that if an organization is a terrorist organization, we want it to be radioactive. Mr. Cole mentioned the Satar case about vagueness. Remember, the Satar case was a district court decision. That was before Congress amended the statute. So Congress has cleaned that up. In addition, frankly, if you read the opinion, it was answers by an assistant U.S. attorney who was not as prepared as he should have been. And that shouldn't mean a statute is unconstitutional. In that case, the assistant United States attorney was being asked questions by the district court. And as Mr. Cole said, he gave an answer that I don't know whether he was being funny or not. Sort of you know it when you see it. As he said, I don't know whether he thought that was humorous, but it obviously is not the way the law should be read. But more important, Congress reacted and changed the statute. But if you have an attorney in the United States who wishes to counsel one of these organizations on how to argue their case or bring their case before the United Nations, is that a crime? Yes, Your Honor. Again, we do not want U.S. persons to be assisting or terrorist organizations to make presentations to the U.N., to television, to a newspaper. We do not want U.S. persons assisting these organizations except as Congress specifically has provided. They do it independently. Very different. That's very different. Exactly. But if they, in other words, if they just on their own somehow get on the agenda of the United Nations and make a speech that somehow gives, what if they write an editorial? They write an op-ed piece and it's directed to the Tamil Tigers. Now this is what you need to do so you can bring your grievance before the United Nations. That's all right. Of course it is, Your Honor. Independent advocacy like that is. What if they call up someone in the Tamil Tigers and get a quote from them? Can I do that? Yes, Your Honor. I don't see how that would be, that wouldn't be operating under the direction, control, et cetera, of the Tamil Tigers. And there's nothing in the statute that says you cannot speak with the Tamil Tigers. That's not in the statute. So you could call the Tamil Tigers and say, would you like to give me a quote? Or call them up and say, you people are bad. You should stop your terrorism and listen to their answer. No, but if you go there and say, here's how you mediate this dispute, that would be a crime. Yes, because if you're trying to help them. Even to make them less radioactive. Even if a person is trying to diffuse the situation. If a person is saying, here's how you mediate, here's what the law of war is, is our military does, and bring together the people of many nations and different beliefs, saying, look, we're not here to settle any disputes, but we're helping you to provide a dispute resolution mechanism, that type of activity would be criminal. And Your Honor, that's a policy decision, just like Regan versus Wald. If you want to go to Cuba and say, I want to go to Cuba and spend a lot of money convincing Cubans that Castro is bad and wrong, and the United States is their friend, you can be criminally prosecuted. Because the embargo on trade with Cuba bars a very broad range of activity. If the Channel Tigers are going to be convinced to give up terrorism, we hope to accomplish that by other means. We're not hoping to accomplish it by U.S. persons training them in how to be peaceful. Because, again, it leads to very serious other problems. Once more, if you're in Congress, you can debate the wisdom or lack of wisdom of this. What serious other problems does it lead to? As I said, it leads to the problem of giving these groups legitimacy while they are still engaged in terrorism. So if the Channel Tigers renounce terrorism, convince the Secretary of State... Well, they did renounce terrorism after 9-11. The Channel Tigers? Yeah, they did renounce it for a time. They had a ceasefire and renounced it for a period of time. It resumed, I know. But, I mean, as I say, that's a little more complex situation over there. Of course it's complex, Your Honor, and that's why this is a decision for the political branches. This is for Congress and the President to make a foreign policy determination. As we know from any number of decisions from the Supreme Court and this Court, when we have complex foreign policy decisions, those are to be made by the political branches. Counsel, how many prosecutions have there been under this statute? I can't give you... If you allow me to get back to you, I can give you an exact number. I think it's around 50, something like that. As I say, if you allow me to get back to you, I can give you an exact number. That won't be necessary. I just want to... And some of them, there are counts listed in the indictment, but that was when the person gets convicted or pled guilty to something else. But there have been a batch of cases where these types of counts are a part of the statute. I've never seen one, but I can recall. There have been quite a few. John Walker Lind, recently in a military criminal court, David Hicks, the, what do they call it, the Lackawanna Seven. There was an indictment just recently, two different indictments in Ohio. They were under this statute that we're talking about, rather than the one with the intent to assist terrorists. It's under this particular statute. Yes, and the Al-Arian case. The Lou Stewart case, that indictment was under the statute. So, as I said, there have been a very large number of them. This statute has been used quite a bit. Well, maybe, you know, maybe I read of one. John Walker Lind, we know about that one. There was a plea there. Yes. A plea bargain. Yes. And I don't remember seeing one. In this court. In this court. Actually, we have an indictment right now that this court, the district court, had thrown out the indictment and this court accepted my arguments and put them reinstated, the Afshari-Romani case. So, this very court has had that very thing. In fact, I think that case is cited in the briefs here. The district court case was cited. No, the court of appeals decision, I believe, is cited here. The Romani. A-F-S-H-A-R-I. This court agreed with the government and reinstated the indictment of a group of Iranians who were providing cash to a foreign terrorist organization, a group trying to overthrow the regime in Iran. So, this court has dealt with the specific statute. Professor Cole said that there are all sorts of things that can be covered by these statutes. And in their brief, they talk about basket weaving, music appreciation, needlepoint. Remember... Sounds like Jerry Brown, huh? I'm sorry. Is Attorney General Brown engaged in needlepoint? No, I'm sorry. He got after the community colleges for teaching needlepoint and basket weaving. Which I'm not agreeing with former Governor Brown at all. I think teaching these things can be extremely valuable. You're taking a stark position. You held them at all. It's a criminal act. Right, because... But this is where, obviously, as the Supreme Court has made clear, hypotheticals at the extreme margin of statute, that doesn't make something unconstitutional. In fact, I have to say, I found that part of the brief sort of somewhat offensive. The notion that it's trivializing what is an extremely important and serious subject, especially when we're dealing with organizations like this. Nobody wants to train them in needlepoint or basket weaving. No, but the medical argument is a different one. Especially in light of tsunami. That presents sort of the classic dilemma, and I understand your argument. I'm just saying that that's a... Isn't that exemption for medical supplies? Medical supplies and religious articles, but not medical services and not training. You can send them in there, but you can't say, okay, here's how you bandage your wounded. Again, they could if they apply to Secretary of State and the Secretary of Grants exemption rule. My hypotheticals are abstinent exemption. Correct. Doctors Without Borders could not come in alone into an area controlled by the Tamil Tigers and provide medical service. I think Doctors Without Borders actually is not a U.S. organization, but let's assume it were. That's correct. There was a U.S. doctor who was a member of that organization. Very good reason why. Besides the goodwill point, as I said, we don't want the Tamil Tigers to be this accepted organization in Sri Lanka. But in addition, if you give training to the organization in medical services, obviously that's something that can be used then elsewhere. And that gets to... I don't understand that answer. Suppose you train somebody in medical services how to treat broken arms. Obviously that can have wonderful application if somebody got hit by a tsunami and an arm broke. It could also have application when they drove a truck bomb and then in running away, they tripped over a rock and broke their arm. And now the Tamil Tigers have personnel who are trained in how to provide this kind of medical attention, like medics, for terrorists. And I thought that was very interesting. Judge Craigerson, when you asked Professor Cole how he thinks Congress should have written the statute, he said, well, you can make it training in things that are obviously tied to terrorism, like building a bomb. But what about driving a truck? As we know, driving a truck overwhelmingly is used for peaceful purposes, but it's also used for driving truck bombs. Or you could even say, I trained somebody in how to shoot because I wanted them to be able to shoot in self-defense when the Sri Lankan army, let's say, is attacking them. I want them to be able to protect their family and their village. Well, fine. So, is training somebody to shoot, if you don't have a specific intent to train them to shoot, to murder innocent civilians? How would Congress possibly draft a statute along the lines that Professor Cole is saying? That's why, again, neither this court nor the Supreme Court requires that kind of a statute. I have a question. Yes, Your Honor. Say we didn't have this statute at all. Don't we have other statutes that would work to eliminate the type of conduct that we think gives aid and comfort to the enemy? No, Your Honor. As I said, we had 2339A, and at the urging of experts in fighting terrorism, Congress made the decision that 2339A was not enough, and we needed this in addition. Your Honor, actually what it was, this was at the urging of our allies around the world. Our allies said, you know, the United States is a nation of immigrants, and so we have large communities here of people who are connected to foreign countries. And the people in the United States were providing massive amounts of money for terrorism by groups like the Camel Tigers, or the real IRA, all sorts of groups. And so other countries were coming to the United States saying, you pretend to be against terrorism, and yet a lot of the money for international terrorism is raised in the United States, and a lot of the assistance for foreign terrorists is raised in the United States. And the State Department heard this, went to Congress, and that's why Congress passed this statute. They said, we don't want just specific intent. We want to make sure that the United States does not become or remain some sort of base of support for international terrorism. So no, Your Honor, another scheme would not work anywhere near as well. Well, you could have had a requirement, couldn't you, that if money is donated to an organization outside the United States, that that donation needs to be reported. Well, Your Honor, even if it's reported, once you make a donation to the Camel Tigers or the real IRA, no U.S. law enforcement agency, nobody here, you yourself, have no idea how the Camel Tigers are actually using that money. As Mr. McCune pointed out in his declaration, in fact, the Camel Tiger leaders even admitted that money that they raise for charitable purposes can be spent for anything. So it's not like organizations in the United States where even groups like the Mafia, you can go after them for tax evasion, drug rings, you can use all sorts of domestic statutes that work within the United States. Once the money goes overseas, or the aid, whatever it is, the technical advice, we have absolutely no idea what you should be looking for. Professor Cole said, what about this vicarious liability points?  Well, it isn't different. If you violate the embargo on trade with Cuba, it doesn't matter what your intent is. If you violate that, that's a crime, that's a felony under the IEPA, the International Emergency Economic Powers Act. And it doesn't matter what Cuba does with what you give them. Just like here, if you give money or other material support to the Camel Tigers, it doesn't matter what the Camel Tigers do with it, even if they spend it for an orphanage. You've violated this foreign policy-oriented statute that is really no different from the ban on trade with Cuba. I'm happy to answer other questions if the Court wishes. Otherwise, I believe I covered the points that I wanted to. The last thing I really want to say is, this is an instance when Congress listened to this Court. This Court and others identified problems with the statute. Congress reacted very quickly and made amendments. It gave further definition to personnel, to training, to the intent requirement. And then, yes, it added service, a provision that is also, by the way, in the executive orders that implement IEPA. And so Congress listened to this Court and fixed the statute. And as this Court well knows, its role is to interpret statutes to make them constitutional. Why didn't the Justice Department listen to us? I'm sorry, we did, Your Honor. We were the ones who were strongly urging Congress to make this change. I remember asking the attorney from the Justice Department who was here. That was me. Was that you? Yes. We've aged a little. Just as much hair or no? I've gotten taller, though, right? You were the same guy. And I asked you that. And you said, no, it's a strict liability statute. Didn't you say that? No, I didn't, Your Honor. But you did. I did not. Obviously, there was miscommunication between us, but that is not a position. But let's assume that it had been. Yeah, you said it's strict liability. Somebody comes knocking at your door and says, we're trying to help poor kids in another country. And maybe they say it's Iran or whatever it is. And so it's for an orphanage. And would you give us $5? And you say, yeah, here's $5. Well, you've committed a crime. No, Your Honor. Again, I regret that. I don't know if we still got the tapes. I regret that there was miscommunication. Your answer was different in front of the panel than it was. Your answers were different in front of the panel than they were in front of the en banc panel, because I sat on both and I asked you that question. And you said you sort of evolved, I guess. Again, Your Honor, I don't believe. I believe not. But I believe, because the Justice Department's position from the beginning was that knowing actually meant what this Court said. You didn't say that in front of this panel last time, because I asked you that question in the en banc. I'm not making a big point. I understand that the Justice Department changed its position on something. Okay. But, you know. Can we leave it at this? The Justice Department did not change its position. I may have not understood correctly. The key point is, as we know, Congress put this in the statute. Congress put this in the statute in response to both what this Court said and very strong lobbying from the Justice Department. Whether we may be able to get these tapes. When I saw your opinion, I said, well, that's fine. We don't have any problem with that. In fact, that's our position. But anyway, neither here nor there, obviously, at this point. Merely historical interest. Well, yeah, it's okay. But Congress fixed it. You know, I like to win one once in a while. You did. You convinced Congress and Congress made this change. And that should be lauded, it seems to me. I got a letter from them telling me that. Maybe there's a Medal of Freedom or something that could be arranged. We'll wait for another day for that. Okay. I'll put in for it, Your Honor. All right. What can I put in for you? All right. Okay. Okay. Thank you. I think it's accurate to say that Congress responded. I don't think it's accurate to say that Congress fixed the problem. No, but they did. Congress did adopt, essentially, the solution we proposed. On knowledge about the character of the group. Yes. But I think this panel did. So don't you think our friends in the other branch of government might think we're engaged in a little bait and switch if we announce it? Ah, but even though you accepted our invitation, we find additional problems. Well, I think the question, Your Honor, is whether it is permissible. Again, imagine somebody who knows that a gang is engaged in criminal activity, knows Operation Rescue is engaged in criminal activity, and provides them with lawful support that is not fungible, that is designed to discourage them. Is it constitutional to allow the government to hold that person criminally responsible for providing non-fungible support? And I think the case law, what you're bound by, is not, you know. Well, that hasn't happened yet, has it? Well, certainly it has. I mean, it's happened in a sense, Your Honor. Our clients have said from the beginning, we want to provide human rights advocacy training. I mean, has there been a trial? But what the government … There's been a trial under this amendment. No, but … You're making a facial challenge. When you get to the judge, then you can write your instructions out and you'll see what he gives. Right, but the problem, Your Honor, is that the government's position is that if our clients engage in human rights advocacy training, they're going to be indicted. And they've made that argument here. They've made it as clear as they could to you. If they talk to you about petitioning the UN, they will be indicted. Now, you know, maybe someone would risk a 15-year criminal sentence on the ground, that maybe they could prevail in an argument about that. But I think what most rational people would do, and certainly what I advise my clients to do, is not engage in the activity until a court says that you have the right to engage in the activity. And I take it that's what the court was trying to do in the first HLP decision, what this court was trying to do in the second HLP decision, essentially carving out some things that people could do. Well, we did, and the Congress took care of it. No, the Congress didn't take care of it, Your Honor, because what they did was they expanded the reach of the statute. So now anything that one might have done … They took care of it as far as that one section is concerned. As far as knowledge of the … Yeah, that's what I'm talking about. Right, but they didn't take care of it, for example, in terms of what this court in the prior decision said was constitutionally protected. Joining a group, advocating on its behalf, teaching of international law and human rights advocacy. All of those are crimes under the new statute if they're done for the benefit of the group. So even writing an op-ed, even if you don't consult with the group. If you consult with the group, then there's a question, have you engaged in personnel by acting under their direction? But even if you don't consult with the group, if you're just writing an op-ed, you say, this law doesn't make sense, and I think it doesn't make sense because I think the LTTE is actually engaged in legitimate activities and people ought to be able to support the tsunami relief efforts without facing 15-year prison sentences. If you do that for the benefit of the group, you face a 15-year prison sentence, even if you do it entirely independently. Entirely independently. So anything you do … Well, you don't recognize the distinction between direct and indirect? I recognize that distinction, Your Honor, but the services provision does not make that distinction. The only provision that makes that distinction is the personnel provision. Congress did not. It could have said material support, only that material support which is directly provided and not engaged in independently will be the crime. They didn't. You don't think we could make that limiting construction in light of that distinction that's made in the statute elsewhere? I think Congress made it with respect to one particular provision. It was considering the service provision. It was considering expert advice or assistance. It was considering training. It decided not to make it with respect to any of those. I'm asking you the question. Do you think that we could narrow the definition by using the same phraseology that Congress used for personnel? I don't think it would solve the problem, Your Honor. Why not? Because I think, again, if I'm writing an op, let's say you did that. You said if you act entirely independently of a group in providing it with all kinds of support, but you don't do it in consultation with it, now you're protected in doing that. But how do you provide human rights training to a group without consulting with it in some way or another? I mean, how do you do that? How do you provide a group with expert advice or assistance without working with the group? You can't. Those are things you can't do independently. And yet that's what this court said before was constitutionally protected and why the court struck down those provisions before. So I don't think it would solve the problem, Your Honor. Why have not the organization sought exemption for those activities that have been identified as protected? Well, there's a couple of reasons, Your Honor. First of all, the exemption provision, all it says is you won't be prosecuted for personnel under the personnel expert advice and training provisions if they give you this advanced license. Right. But anything you do They don't call it a license, but They don't call it a license, right. But they also at the same time say anything you do for the benefit of the group will be liable under the services provision. And there's no exemption in the services provision. So until you try to get the exemption, you really don't know. No, Your Honor. But again, the law says services are a crime. The exemption does not exempt services. If my client comes to me and says, well, look, I just got an exemption saying that I can't be prosecuted under the personnel provision if I do X. And can I do it? And I say, well, is it being done for the benefit of the group?  I don't think we want to encourage you to engage in human rights advocacy training. What am I supposed to say? Go ahead and do it. You might face a 15-year prison sentence, but you can make an argument to the jury about it. No, what I have to tell them is you should not violate a law that on its face prohibits your conduct. So one is that the exemption doesn't work. Nobody has been granted exemption as far as I know. Has anyone applied? I don't even know if anybody has applied. Number two is it's an unconstitutional exemption scheme for the reasons we set out in our brief. Well, it's not a licensing scheme, so I'm not sure that those cases follow necessarily. Because it's not a licensing scheme. It's not an approval for a license. Well, you know, it doesn't have the term license in it, but it is indistinguishable from the Lakewood licensing scheme. I think that's a broader distinction. Lakewood was directed towards specific First Amendment activity. Here you have prohibitions on a whole bunch of things that have nothing to do with the First Amendment. And exemptions, which can be granted or not, based on a whole range of activities, have nothing to do with the First Amendment. So there's no content-based distinction that's written right into the regulation or statute. And you can't say that that case is on all fours. Well, here's why I think it is, Your Honor. Lakewood didn't have any content-based restriction either. It just gave the mayor unfettered discretion so he could use it for content discrimination. What can you say about any licensing scheme? Well, here's what the court said in Lakewood. They said you distinguish between licensing schemes that don't implicate speech and associational concerns, which you do have to go through and exhaust, and licensing schemes that implicate the speech and associational concerns, which you have the right to challenge on its face. What Congress did here was carve out the very provisions that this court had identified as the ones that implicate association and speech, training, personnel, and expert advice or assistance. So this does, in fact, have the precise nexus to association and speech concerns that the court in Lakewood said you have to have before you can challenge a licensing scheme in advance. So we didn't do it because it's futile and because we're not constitutionally required to do it, where, as here, the scheme, this is not a licensing scheme for the whole statute. That might be different. It carves out those forms of support which this court already identified as raising First Amendment speech and association concerns. I just wanted to take the opportunity to respond to a couple of the points that Mr. Letter made. His first point was that somehow the en banc decision foreclosed the argument that the United States' ability to put an embargo on the United Kingdom does not mean that it has an ability to target Amnesty International for any reason whatsoever. That's not fair. Not for any reason whatsoever. These organizations have not been targeted for any reason whatsoever. They've been targeted because they've been designated as terrorist organizations. So it's not really a good argument to say Amnesty International because that organization has not been identified or designated, you know, in a comparable way. Right. No, that's true, Your Honor. But, again, the point that they're making is that the personal guilt principle, right, ought not apply here because it's in the foreign context. And then the only cases they cite to support that are cases that allow for embargoes on trade with foreign nations. And my point is simply that there is a big difference between an embargo on a foreign nation and an embargo on a political organization that happens to be incorporated in a foreign country, regardless of the basis for the designation, whether it's terrorism or whether we don't like what they say or whether they've engaged in some sort of other illegal conduct. But that's uniquely in the realm of the executive and legislative branches as opposed to the judicial branch. I mean, I think the case law pretty much agrees that in those arenas, we give a bit more deference to the judgments that are made either in the executive branch or the legislative branch. We don't try to second-guess those. No, and we're not asking you to second-guess any policy decision. What are you asking us? What we're asking you to do is to require Congress to enact a statute that is consistent with the Constitution, consistent with three principles of the Constitution, the personal guilt principle, the vagueness principle, and the overbreadth principle. And this Court has already said that that's within its ambit. That's precisely the kinds of questions that the Court addressed previously. It didn't say, well, it's foreign. But the personal guilt was addressed in a way that was not favorable to your argument. Well, it didn't go as far as what I'm suggesting now. It didn't actually address. We had actually not made the argument in the form that we've made it here to the Court. And the Court addressed the question, again, about the one element but not the other element, the element of what you have to know about the group but not the element of what you have to know about your support. And our position, again, is that the only way that you can avoid the personal guilt principle, avoid the prohibition on personal guilt, is if Congress acts in a more narrowly tailored fashion. Maybe a knowledge requirement is enough. Maybe it's enough to say if you give support, no one gives it. You know, we've already told you we think it's enough, you know. Right. Okay. All right. I will. I think all of you. We are on that, you know. So at least that's where I am on that. Okay. All right. But just let me say that on the question about whether the en banc decision foreclosed anything about the foreign context, it clearly didn't. All the en banc decision said was it was upholding the First Amendment decision, and it specifically said we're not addressing any of the other arguments, including the Fifth Amendment argument. Yeah. Number two. I think we got everything that you want to tell us, haven't we? Well, I mean, Mr. Leonard got a lot more time. Did I get time to at least respond? He's got more time than he got. He's got 13 minutes over right now. You got about 14, 15 minutes. Where's our timekeeper? How much more time has he got? What? He's got over 100 minutes. How much time did we give the government? About 12 minutes over. 12 minutes over? And you got 13. I'm happy to sit down. And you also got some before, too, you know. We're not bargaining with you. No, I know. And I'm in no position to bargain. I just thought that there were some things that Mr. Leonard spoke about. I'm ready to make deals any time, you know. But I think that we understand what your argument is, you know. You've already said it. I mean, what else do you want to tell us? What do you want to tell us that you haven't already told us? If I could just say a couple of things. With respect to the findings that the court asked Mr. Leonard about and Mr. Leonard referred to, the Supreme Court in its Gonzalez v. Carhart decision on the partial birth abortion statute expressly said that when constitutional issues are at stake, the court's obligation is not to accept the findings but to actually look at them and ask independently whether there's a basis for them. And when Judge Rawlinson asked what's their basis for the finding of this, this broad-based finding of fungibility, anything one does to support a group will somehow support its illegal activities, there was not one word of testimony about one terrorist organization to support that notion. And there certainly was no finding that providing human rights advocacy training or all the kinds of non-fungible support, medical services and the like, somehow supported the terrorist activities of the group. So that's one. With respect to, well, I'll stop there. I don't want to build on that. Well, I think, you know, at the end of the day, I want you to leave here happy. At the end of the day, well, there's only one way to go. Exactly. But you can't make both of us happy. That's the problem that we have. Well, we want you to leave here with us. Here's my parting shot here. We are not asking this court to second-guess any kind of policy decisions. All we're saying is that when Congress seeks to cut off funding for terrorist groups, it has to do it in a more narrowly tailored way. There are many more narrowly tailored ways that Congress could choose. For example, it could say, well, all BINs we're going to prohibit. It could say dual-use items, you've got to show by due diligence that your support is not going to further the illegal activities of the group. It could require, it could make more specific definitions of the terms which the district court found were unconstitutionally vague and I think proper. And so, and what it can't do, what it can't do is enact a statute that's so broad that it criminalizes activity that is under no conceivable understanding fungible, that in no way furthers terrorist activity and that was not intended to further terrorist activity. That's holding innocent people culpable and that's what the Fifth Amendment prohibits. Gotcha. Okay. If the court has questions for me, I'm happy to answer, otherwise I think Mr. Cole and I have tried your patience enough. We've done lots of patience. If the court has questions, I'll be happy to answer, otherwise I think... Is there a question? No question. Thank you. Glad to have you here today. Well, adjourned.
judges: Pregerson, Thomas, Rawlinson